



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELLSWORTH INVESTMENTS LIMITED, Individually and on Behalf of All Others Similarly Situated,<br><br>                        Plaintiff,<br><br>    vs.<br><br>SINOHUB, INC., HENRY T. COCHRAN, DE HUI LI, LEI XIA, DANIEL CHI KEUNG LUI, and BAKER TILLY HONG KONG,<br><br>                       Defendants. | Civil Action No.<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

1.    Plaintiff Ellsworth Investments Limited ("Ellsworth Investments" or "Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of the Defendants' public documents, conference calls, and United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding SinoHub, Inc. ("SinoHub" or the "Company"), securities analysts' reports about the Company, and information readily available on the Internet.  Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

### NATURE OF THE ACTION AND OVERVIEW

2.    This is a class action on behalf of purchasers of SinoHub's common stock between May 17, 2010 and August 21, 2012 (the "Class Period"), brought against various persons and entities pursuant to the Securities Exchange Act of 1934 (the "Exchange Act").  The Defendants are: (1) SinoHub; (2) Henry T. Cochran ("Cochran"), the Company's CEO; (3) De Hui Li ("Li"), the Company's CFO; (4) Lei Xia ("Xia"), the Company's President; (5) Daniel Chi Keung Lui ("Lui"), the Company's Audit Committee Chairman and financial expert; and (6) Baker Tilly Hong Kong ("BTHK"), the Company's outside auditor who issued unqualified opinion letters in connection with its audit of SinoHub's financial statements.

3.    SinoHub, Inc. was founded in 2000 by Cochran, a software entrepreneur, and Xia, an electronics expert.  In May 2008, Liberty Alliance, Inc., its wholly-owned subsidiary SinoHub Acquisition Corp., SinoHub, Inc., and Steven L. White, the principal stockholder of Liberty Alliance, Inc., entered into an Agreement and Plan of Merger pursuant to which SinoHub Acquisition Corp. merged with and into SinoHub, Inc., and SinoHub, Inc. became a wholly-owned subsidiary of Liberty Alliance, Inc.  Subsequent to the completion of the reverse merger,

on July 18, 2008, SinoHub, Inc. amended its certificate of incorporation to change its name to SinoHub International, Inc.; Liberty Alliance, Inc. amended its certificate of incorporation to change its name to SinoHub, Inc.; and shares of SinoHub, Inc. common stock began to be reported on the over-the-counter bulletin board under the symbol "SIHI." On August 7, 2009, SinoHub's common stock began trading on the New York Stock Exchange "NYSE" under the symbol "SIHI."

4.     SinoHub is an electronics company based in Shenzhen, People's Republic of China ("PRC"). The Company states that it has over 900 employees, with annual revenue of $196.7 million in 2010.

5.     SinoHub has two business segments: electronic product manufacturing and sales (Integrated Contract Manufacturing ("ICM")), and electronic component sales and services ("ECSS"), which is comprised of electronic component sales ("ECP") and electronic component supply chain management services ("SCM"). In 2011, SinoHub's business mix was 46% ICM and 54% ECSS, as compared to 31% ICM and 69% ECSS in 2010. The ICM segment is currently focused on providing custom, private label mobile phones to developing countries. SinoHub's ECSS segment includes procurement fulfillment and spot electronic component sales to manufacturers and design houses, as well as warehousing, delivery, and import/export. The Company currently processes electronic component imports of $1 billion (annually) into China, for customers who produce finished goods for Huawei, China Mobile, and Samsung.

6.     On May 17, 2010, the first day of the Class Period, SinoHub filed its Form 10-Q for the quarter ended March 31, 2010, in which it reported an increase in revenues of 113% from the year-earlier period due to higher than expected revenue from the VCM business (later renamed "ICM") and strong growth in ECP revenues.

7.     On August 12, 2010, SinoHub filed its Form 10-Q for the quarter ended June 30, 2010, in which it reported that revenues for the six month period ending June 30, 2010 had increased 67% from the year-earlier period.

8.     On November 12, 2010, SinoHub filed its Form 10-Q for the quarter ended September 30, 2012 and issued a press release touting that it had increased net sales by 54.1% from the year-earlier period due to continued strong revenue growth in the VCM business (later renamed "ICM").  Further, SinoHub raised its full year revenue guidance from $180 million to $192 million, representing an anticipated year-over-year growth of 50% over 2009.

9.     On March 14, 2011, the Company filed its Form 10-K for 2010, which announced a 53% increase in revenues from the previous year, and provided revenue guidance for 2011 of $255 million, which represented a 30% increase in revenues.  The Company further disclosed that it had spent a significant amount of capital to propel its new ICM business, adding four new assembly lines in 2010.  SinoHub was considered by analysts to be undervalued because SinoHub had consistently met or exceeded earnings expectations and was continuously expanding its business.

10.     On May 16, 2011, to the surprise of investors, the Company announced it would be restating its Form 10-K for 2010 and Form 10-Qs for all three quarters in 2010 due to material misstatements of liabilities and expenses and significant deficiencies in internal control.  The market reacted negatively to the news and on May 16, 2011, SinoHub's stock price dropped from an opening price of $1.76/share to a closing price of $1.36, *a drop of 23% in one trading day*.

11.     Throughout the Class Period, the Defendants maintained that the Company's internal controls over financial reporting were effective.  This was simply not true.  As evidenced

by the Company's correspondence with the SEC regarding the Company's internal controls, Defendants knowingly or recklessly implemented, or ignored the existence of, ineffective internal controls, which ultimately resulted in the use of improper accounting procedures and the overstatement of the Company's financial statements and future earnings potential.

12.     Beginning in November 2011, the SEC began inquiring into the effectiveness of SinoHub's internal controls, including the extent of knowledge of U.S. Generally Accepted Accounting Principles ("GAAP") within the Company.  The Company ultimately admitted to the SEC that none of its management or accounting personnel were Certified Public Accountants or possessed sufficient knowledge of GAAP.  Nevertheless, the Company continued to represent to the public that its financial statements were prepared in accordance with U.S. GAAP.  The Company also continued to assure investors and analysts that its ICM business would be a major contributor of revenue in 2011.

13.     On March 30, 2012, the Company released its Form 10-K for 2011, which revealed that SinoHub had not experienced any revenue growth during the year.  SinoHub's stock price responded accordingly, closing at $0.54/share on March 30, 2012, after opening that day at $0.63/share, a drop of 16%.

14.     Although the Company's revenues were now steadily decreasing and its prospects for future growth were dimming, SinoHub continued to represent in its Form 10-K for 2011 that the Company had remediated its internal control problems, and that internal controls were now "effective."  Once again, this was simply not true.  In fact, the Company was now in a downward spiral.

15.     On August 14, 2012, the Company shocked investors when it announced that it would be unable to file its Form 10-Q for June 30, 2012 within the prescribed time period.  The

Company attempted to mitigate damage to its stock price by stating that it expected to file the report within the extension period.  Nevertheless, upon the disclosure of this information, and over the next three trading days, SinoHub's stock dropped approximately 26% on unusually high trading volume.

16.     On August 21, 2012, the last day of the Class Period, SinoHub announced that it would not file its Form 10-Q within the extended period as a result of a delay in the Company's retrieval of information requested by the Company's auditors to confirm prior-period sales associated with SinoHub's ECP business.  Upon information and belief, Defendants delayed retrieval of this sales information because it did not exist, the Company lacked the internal controls necessary to retrieve it, or the Company knew its sales information had been misstated to make the Company seem more profitable. The Company announced results for the quarter ended June 30, 2012, stating that it had suffered a net loss of $2.7 million.  Over the next three trading days, SinoHub's stock price dropped by 20%.

17.     Ten days after the close of the Class Period, BTHK, the Company's auditor, resigned from its position.  According to BTHK, it resigned because, among other things, it had not received sufficient documentation to confirm that sales made in connection with the trading of electronic components satisfied the requirements for revenue recognition and it was unable to obtain sufficient documentation from SinoHub to satisfactorily review the use of personal bank accounts of the CFO to collect sub-contracting charges and sales deposits of PRC customers.

18.     On September 19, 2012, the Company announced that on September 14, 2012, SinoHub's three purportedly independent directors, Lui, Jeff He, and Ted L. Shen, advised the Chairman of the Board of Directors that they were resigning effective September 14, 2012.  The purportedly independent directors stated that their resignations were the result of three concerns:

5

- The resignation of the Company's auditor, BTHK, and the potential unavailability of funds to hire a new auditor;
- The lack of funding to support an independent investigation of the Company and the CEO's inability to control the Company's operations, especially the allocation of funds for outside professionals; and
- The inability of the Audit Committee to arrive at any opinion on the Company's accuracy of financial data or efficiency in management and control because it had not been provided with financial information for review.

19.     The Company's announcement stated that at the time of their resignation, Lui, He, and Shen were members of the Board's Audit Committee, Compensation Committee, and Nominating Committee, with Mr. Lui being the Chairman of the Audit Committee and Mr. He being the Chairman of the Company's Compensation and Nominating Committees. ***Significantly, SinoHub's September 19, 2012 announcement admitted that the Audit Committee had insufficient internal controls over the Company's financial information.***

20.     On September 24, 2012, SinoHub announced that it had received a letter from the NYSE notifying the Company that its stock was subject to delisting because management engaged in operations contrary to the public interest.   According to the NYSE: (1) the Company's use of personal bank accounts in the name of its CFO, Defendant Li, and a finance manager raised significant concerns over whether such accounts were used for legitimate business purposes; (2) the CFO's sole control over the Company's bank accounts raised serious concerns about the Company's internal controls; (3) the resignation of the Company's auditor, BTHK, raised serious concerns over the Company's financial reporting; and (4) the Company continued to be in violation of the Company Guide and the Exchange Act because it no longer had an audit committee and did not provide funding for the payment of auditors or to engage a third party to conduct an investigation into its internal control deficiencies and accounting regularities.   The Company was subsequently delisted from the NYSE and its stock is virtually worthless.

21.    As set forth in more detail below, as a direct and proximate result of the Defendants' alleged securities law violations, investors purchased SinoHub securities at artificially inflated prices.  As the Company's true state of affairs became known, SinoHub's stock traded at its true value:



SinoHub, Inc. (SIHI)

JURISDICTION AND VENUE

22.    The claims asserted herein arise under Sections 10(b), 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

23.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

24.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b), and Section 27 of the Exchange Act (15 U.S.C. §78aa).  Moreover, many of the materially false and/or misleading statements were made in or issued from this District, and, during the Class Period, SinoHub securities were traded through the NYSE, which is located in this District.

25.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

26.    Plaintiff Ellsworth Investments purchased SinoHub common stock during the Class Period as described in the attached Certification and was damaged thereby.

27.    Defendant SinoHub is incorporated in Delaware and maintains its principal executive offices at 6/F, Building 51, Road 5, Qiongyu Blvd., Technology Park, Nanshan District, Shenzhen 518057, People's Republic of China.

28.    At all relevant times hereto, Defendant Cochran served as SinoHub's Chairman of the Board, Chief Executive Officer, Secretary, and Treasurer.

29.    At all times relevant hereto, Defendant Li served as SinoHub's Chief Financial Officer.

30.    At all times relevant hereto, Defendant Xia served as SinoHub's President.

31.    At all times relevant hereto, Defendant Lui served as a director of SinoHub, Chairman of the Audit Committee, and Audit Committee financial expert.

32.    Defendants Cochran, Li, Xia, and Lui are sometimes collectively referred to herein as the "Individual Defendants."

33.    Defendant BTHK is a public accounting firm registered with the Public Company Accounting Oversight Board ("PCAOB"), with its business address at 2/F, 625 King's Road, North Point, Hong Kong.  BTHK audited the financial statements of SinoHub for the years ending 2010 and 2011.

## BACKGROUND

34.     Since the reverse merger, Defendants Cochran, Li, Xia, and Lui have operated the Company with one goal in mind; to use SinoHub's operations to personally profit themselves and their friends at the expense of investors who purchased SinoHub's stock on the U.S. Exchange.  By hiring an auditing firm that acquiesced and participated in their misconduct, Defendants were able to pull the wool over investors' eyes and hide the true financial condition of the Company.  By maintaining ineffective internal controls throughout the Class Period, Defendants were able to manipulate revenue and other accounting metrics without detection, thereby presenting the illusion of a growth company that was unfairly undervalued.

35.     The financial statements and disclosures contained in SinoHub's Forms 10-K and 10-Q, filed with the SEC and disseminated to investors, misstated SinoHub's true financial condition because the information contained therein was not prepared in conformity with U.S. GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for, *inter alia*, its liabilities, expenses, stockholders' equity, revenues, operating income, and net income in violation of GAAP rules.

### A.     Obligations Imposed by the Securities Laws and U.S. GAAP

36.     Effective for financial statements issued after September 15, 2009, the Financial Accounting Standards Board ("FASB") established the FASB Accounting Standards Codification ("ASC") "as the source of authoritative generally accepted accounting principles (GAAP) recognized by the FASB to be applied by nongovernmental entities.  Rules and interpretive releases of the Securities and Exchange Commission (SEC) under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants."

37.     Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements.   17 C.F.R. §210.10-01(a).

38.     Defendant Lui has been identified by SinoHub as a "financial expert."  To be designated a financial expert, Defendant Lui had to meet specific qualifications.  According to Item 407(d)(5)(ii) of Regulation S-K under the Exchange Act, an audit committee financial expert "has the following attributes: (A) an understanding of generally accepted accounting principles ("GAAP") and financial statements; (B) the ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves; (C) experience preparing, auditing, analyzing or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the registrants' financial statements, or experience actively supervising one or more persons engaged in such activities; (D) an understanding of internal control over financial reporting; and (E) an understanding of audit committee functions."

39.     ASC Topic 605-10, *Revenue Recognition*, provides guidance regarding the proper application of U.S. GAAP to revenues recorded in financial statements.   In general, the recognition of revenue and gains of an entity involves the consideration of two factors; whether the revenue is realized or realizable and whether the revenue has been earned.  ASC Topic 605-10-25-1.  The SEC believes that revenue generally is realized or realizable and earned when all

of the following criteria are met: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable; and (4) collectability is reasonably assured.  Staff Accounting Bulletin Topic 13, *Revenue Recognition.*

### 1.   Defendants Were Required to Disclose Risks and Uncertainties

40.    ASC Topic 275-10-50 requires that companies disclose risks and uncertainties existing in the following areas:  (1) nature of operations; (2) use of estimates in the preparation of financial statements; (3) certain significant estimates; and (4) current vulnerability due to certain concentrations.

41.    Pursuant to SEC Staff Accounting Bulletin No. 104, and Regulation S-K, Article 303, the management of a public corporation must disclose in its periodic reports filed with the SEC, "known trends or any known demands, commitments, events or uncertainties" that are reasonably likely to have a material impact on a company's sales revenues, income or liquidity, or cause previously reported financial information not to be indicative of future operating results. 17 C.F.R. §229.303(a)(l)-(3) and Instruction 3.

### 2.   Defendants Were Required to Sign and Certify that the Company's Financial Statements Are Fairly Presented and that Internal Controls Are Effective

42.    In an effort to protect investors from corporate wrongdoing by improving the accuracy and reliability of corporate disclosures made pursuant to securities laws, Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), entitled "Corporate responsibility for financial reports," directs that the SEC shall promulgate regulations requiring that, in relevant part, "for each company filing periodic reports under section 13(a) or 15(d) of the Securities Exchange Act of 1934 . . . the principal executive officer or officers and the principal financial officer or

11

officers, or person performing similar functions, certify in each annual or quarterly report filed or submitted under either such section of such Act that:

(1)     the signing officer has reviewed the report;

(2)     based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading;

(3)     based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report;

(4)     the signing officers–

    (A)     are responsible for establishing and maintaining internal controls;

    (B)     have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared;

    (C)     have evaluated the effectiveness of the issuers internal controls as of a date within 90 days prior to the report; and

    (D)     have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date.

(5)     the signing officers have disclosed to the issuer's auditors and the audit committee of the board of directors (or persons fulfilling the equivalent function)–

    (A)     all significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize, and report financial data and have identified for the issuer's auditors any material weaknesses in internal controls; and

> > (B)   any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and
>
> (6)   the signing officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses."

43.   Likewise, §906 of SOX, entitled "Failure of corporate officers to certify financial reports" requires, in relevant part:

> > (a)   Certification of Periodic Financial Reports.  Each periodic report containing financial statements filed by an issuer with the Securities Exchange Commission pursuant to 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a) or 78o(d)) shall be accompanied by a written statement by the chief executive officer and chief financial officer (or equivalent thereof) of the issuer.
>
> > (b)   Content.  The statement required under subsection (a) shall certify that the periodic report containing the financial statements fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act [o]f 1934 (15 U.S.C. 78m(a) or 78o(d)) and that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the issuer.

**3.   Defendants Were Required to Disclose Material Weaknesses in the Company's Internal Control over Financial Reporting**

44.   Pursuant to §404 of SOX, on June 5, 2003, the SEC issued a final rule and amended Item 307 of Regulations S-K and S-B.  *See In re Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports,* 2003 WL 21294970, at *11 (S.E.C. Release No. 8238) (June 5, 2003).  Specifically, as part of a company's corporate governance obligations, management is required to include an internal control report of management that contains the following in its annual report:

(1)  a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the company;

(2)  a statement identifying the framework used by management to conduct the required evaluation of the effectiveness of the company's internal control over financial reporting;

(3)  management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether or not the company's internal control over financial reporting is effective. ***The assessment must include disclosure of any 'material weaknesses' in the company's internal control over financial reporting identified by management.  Management is not permitted to conclude that the company's internal control over financial reporting is effective if there are one or more material weaknesses in the company's internal control over financial reporting***; and

(4)  a statement that the registered public accounting firm that audited the financial statements included in the annual report has issued an attestation report on management's assessment of the registrant's internal control over financial reporting.

[Emphasis added.]

**B.      Defendants' False and Misleading Statements**

45.      Defendants made affirmative representations regarding SinoHub's revenue recognition policies and procedures in the Company's Form 10-Ks for 2010 and 2011 and Form 10-Qs for all quarters in 2010 and 2011.  Defendants represented that the Company prepared its consolidated financial statements in accordance U.S. GAAP and the rules and regulations of the SEC.  The MD&As, contained in each of those filings, stated:

Revenues for SCM services are earned from both the SCM and procurement-fulfillment programs and are primarily based on a percentage of inventory value handled for a customer.  The Company recognizes revenue from SCM services when the services are provided.  Revenues from ECP and ICM businesses are based on quoted prices and are recognized at the time of shipment to customers. Revenues are recognized on the gross amount billed to customers.  Sales are recorded net of discounts and allowances.  In all cases, revenue is recognized when there is persuasive evidence of an arrangement, delivery has occurred or

14

services rendered, the sales price is determinable, and collectability is reasonably assured.

* * *

The Company must generally pay the purchase price of electronic components for procurement-fulfillment customers and then recoup the purchase price from the customer after delivery. We purchase only standard components which are readily saleable. To date we have not had any collection problems with any procurement-fulfillment project funded. The Company's borrowings vary based on the timing of procurement-fulfillment projects, large spot component sales, use of our VAT import line and use of our export reimbursement line.

46.     As described in greater detail below, these statements were false and misleading because SinoHub failed to properly account for revenues in accordance with U.S. GAAP and, as a result, materially misstated revenue, operating income and net income since at least the beginning of the second quarter of 2010 and continuing through the end of the Class Period.

47.     On May 17, 2010, SinoHub filed its Form 10-Q for the first quarter of 2010 (signed by Defendants Cochran and Li), in which it reported a significant increase in revenues (net sales)[1]:

Net sales for three months ended March 31, 2010 were $38.6 million, up 113% from $18.1 million in the year-earlier period. Revenues increased dramatically in Q1 2010 due to larger than expected revenue from the VCM business and strong growth in ECP revenues. The Company reports net sales on the basis of three business categories, supply chain management services, electronic component sales, and VCM business.

48.     Moreover, regarding internal controls, SinoHub represented the following:

Pursuant to Rule 13a-15(b) under the Securities Exchange Act of 1934 ("Exchange Act"), the Company carried out an evaluation, with the participation of the Company's management, including the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") (the Company's principal financial and accounting officer), of the effectiveness of the Company's disclosure controls and procedures (as defined under Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report. Based upon that evaluation, the Company's CEO and CFO concluded that the Company's disclosure controls and procedures were effective as of March 31, 2010 to ensure that information

---

[1] The Company uses the terms "revenue" and "net sales" interchangeably.

required to be disclosed by the Company in the reports that the Company files or submits under the Exchange Act, is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including the Company's CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

49.     On August 12, 2010, the Company filed its Form 10-Q for the second quarter

(signed by Defendants Cochran and Li), in which it made the following statements:

> Net sales for the three months and six months ended June 30, 2010 were $43.9 million and $82.5 million respectively, up 40% and 67% from $31.4 million and $49.5 million recorded respectively in the year-earlier periods. . . In the six months ended June 30, 2010, net sales of electronic components increased 31% to $59.4 million from $45.4 million in the year-earlier periods. In the three and six months ended June 30, 2010, net sales of VCM business were $13.3 million and $19.7 million, respectively.
>
> * * *
>
> The Company's strategic plans include continued expansion and support of our SCM Platform (consisting of SinoHub SCM, key service centers in Hong Kong, Shenzhen, and Shanghai, and a supply chain management service team providing real time support), growth in our electronic component and mobile device sales businesses, including growth of our VCM business, investment in inventory for both procurement-fulfillment and VCM orders, and investment in the manufacturing facility for our VCM business.

50.     The Company also stated that its disclosure controls and procedures were

effective as of June 30, 2010 and further represented that:

> There have not been any changes in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal period to which this report relates that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

51.     On November 12, 2010, the Company filed its Form 10-Q (signed by Defendants

Cochran and Li) in which it represented the following:

> Net sales for the three months ended September 30, 2010 were $55.8 million, up 54.1% from $36.2 million in the year-earlier period. Net sales increased in the three months ended September 30, 2010 due to continued strong revenue growth in the VCM business, which produced $19.0 million in net sales. Net sales for the

nine months ended September 30, 2010 were $138.2 million, up 61.4% from $85.6 million in the prior year period.

* * *

In the three months ended September 30, 2010, net sales of electronic components increased 2.9% to $35.3 million from $34.3 million in the year-earlier period. In the nine months ended September 30, 2010, ECP net sales increased to $94.7 million from $79.7 million in the prior year period due to new customer additions and higher volumes among existing customers. In the three months ended September 30, 2010, net sales in the VCM business were $19.0 million, an increase of 42.9% from the $13.3 million recorded in the three months ended June 30, 2010.

* * *

The Company's strategic plans include continued expansion and support of our SCM Platform (consisting of SinoHub SCM, key service centers in Hong Kong, Shenzhen, and Shanghai, and a supply chain management service team providing real time support), growth in our electronic component and mobile device sales businesses, including growth of our VCM business, investment in inventory for both procurement-fulfillment and VCM orders, and investment in the manufacturing facility for our VCM business.

52.    Moreover, the Company again stated that its disclosure controls and procedures were effective as of September 30, 2010 and further represented the following:

There have not been any changes in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal period to which this report relates that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

53.    In its Form 8-K and press release filed on November 12, 2010, the Company reiterated its revenue growth and provided full year guidance:

"Our strong third quarter sales results were led by record shipments and revenue from our custom design mobile phone contract manufacturing business. We produced approximately 320,000 handsets for the third quarter, up from 250,000 in the second quarter, with sales being strongest in Indonesia and India. With growing adoption of our unique new business model which allows us to provide strategic support for handset distributors, we are optimistic in maintaining our positive momentum in VCM," said Harry Cochran, Chief Executive Officer of

17

SinoHub. "We are also very pleased that ECP experienced growth as business volume increased and, more importantly, the gross margin in ECP improved substantially to 15.6% from 12.2% in the second quarter of 2010."

\* \* \*

Based on the strong results through the first nine months of 2010, Management is raising FY 2010 revenue guidance to $192 million from the prior guidance of $180 million, representing anticipated year-over-year growth of approximately 50% over 2009.

54.     These aforementioned statements were false and/or misleading because they failed to disclose that:

- SinoHub's officers and managers did not have sufficient knowledge of U.S. GAAP in order to adequately comply with SEC regulations;

- Sinohub's internal controls were not effective;

- the Company had failed to properly record the common stock purchase warrants in connection with a March 2, 2010 private placement, in violation of Accounting Standards Codification 815-40, *Derivatives and Hedging – Contracts in Entity's Own Equity*;

- the Company failed to properly record the revenues of its electronic component parts business in violation of Accounting Standards Codification Topic 605, *Revenue Recognition*;

- the Company did not intend to grow its ECP business; and

- the Company knew its VCM business would not contribute sustainable revenue growth in the future.

55.     In the next three trading days, SinoHub's stock increased from $2.58 per share on November 12, 2010 to a close of $3.04 per share on November 17, 2010, a gain of 15%. While SinoHub's stock was artificially inflated, Jan CG Rejbo, one of Sinohub's largest shareholders, sold 237,150 shares of Sinohub stock from November 23-29, 2010 in the open market, reaping proceeds of approximately $711,450. On December 10, 2010, while SinoHub's stock was artificially inflated, Defendant Cochran sold shares of SinoHub stock for $270,000.

18

56.     On January 5, 2011, SinoHub filed a Form S-3 Registration Statement, which the

SEC declared effective on January 12, 2011.   The Registration Statement was signed by

Defendants Cochran, Li, Xia, and Lui, as well as directors Will Wang Graylin, Jeff Qi He, and

Richard L. King.

57.     The Registration Statement incorporated the following documents, among others:

- Annual Report on Form 10-K for the year ended December 31, 2009, filed on March 31, 2010;
- Quarterly Report on Form 10-Q for the quarter ended March 31, 2010, filed on May 17, 2010;
- Definitive Proxy Statement, dated April 30, 2010, filed on April 30, 2010;
- Quarterly Report on Form 10-Q for the quarter ended June 30, 2010, filed on August 12, 2010; and
- Quarterly Report on Form 10-Q for the quarter ended September 30, 2010, filed on November 12, 2010.

58.     On January 31, 2011, SinoHub announced that it had exceeded its goal of selling

1 million mobile phones and had sold approximately 1.15 million mobile phones in 2010 and

renamed its mobile phone manufacturing and sales business Integrated Contract Manufacturing

("ICM").   With regards to the future revenue capabilities of the ICM business, the Company

stated the following:

> SinoHub has built up substantial capacity in its ICM factory in anticipation of
> increased sales in 2011. From a starting point of four assembly lines in April
> 2010, the company added four more assembly lines in Q3 2010. Each assembly
> line is capable of producing 37,500 phones per month on average, giving SinoHub
> the capacity to manufacture 300,000 phones per month. After installing its first
> three high-speed surface mount technology (SMT) lines to make motherboards
> and a medium-speed line that is primarily used for setup and testing in July 2010,
> SinoHub added four more high-speed SMT lines in the fourth quarter of 2010.
> Each high-speed SMT line is capable of producing approximately 90,000
> motherboards per month, thus giving the company the capacity to produce over
> 630,000 motherboards per month.
>
> "We are seeing tremendous growth in our mobile phone manufacturing and sales
> business", said Harry Cochran, CEO of SinoHub. "Our ability to provide strategic
> support through our online joint design process and our online order tracking is
> extremely appealing to a wide variety of customers. The new name for this

division more precisely portrays the value proposition we offer. With an established customer base that is purchasing more phones, the recent contracts we have announced and a growing pipeline of new customers, we expect growth in our ICM business to accelerate from the second quarter through the end of 2011. We expect to sell approximately 3 million phones in 2011, a 160% increase over last year."

59.     These statements were false and misleading because the Company did not have an established customer base for the ICM business, did not have a growing pipeline of new customers, and SinoHub failed to disclose that it had a significant customer concentration. Furthermore, Sinohub's assembly lines would have had to operate at near full capacity for the entire year in order to produce 3 million mobile phones.

60.     On March 14, 2011, SinoHub filed its Form 10-K for 2010, signed by Defendants Cochran, Li, Xia, and Lui, as well as directors Will Wang Graylin, Jeff Qi He, and Ted Liangche Shen. Cochran and Li also signed SOX certifications representing, among other things, that: (1) the Form 10-K did not contain any untrue statement of a material fact or omit to state a material fact; (2) the financial statements fairly presented the Company's financial condition, results of operations and cash flow; and (3) that they had disclosed all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which were reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial information.    BTHK, SinoHub's auditor, issued a clean audit opinion representing that the Company's financial statements presented fairly, in all material respects, the financial position of SinoHub and its subsidiaries as of December 31, 2010 and 2009, and its operations and cash flow were presented in conformity with U.S. GAAP.

61.     In its Form 10-K for the year ended December 31, 2010, SinoHub made the following representations:

Net sales for the year ended December 31, 2010 were $196.7 million, up 53.2% from $128.4 million recorded in 2009.

* * *

In the year ended December 31, 2010, net sales of the ECSS segment increased 5.5% to $135.5 million from $128.4 million in 2009. In the year ended December 31, 2010, net sales of the ICM segment were $61.2 million. The net sales in this segment were immaterial during the prior year. The rapid growth of our integrated contract manufacturing business was supported by sales of new equity in the first quarter of 2010.

* * *

SinoHub's strategic plan is focused on the growth of our ICM business segment. In 2011 the Company will focus on mobile phone sales in Indonesia and India. This will require investment in inventory for ICM orders, and, depending on our growth, additional investment in our manufacturing and assembling facilities.

62. With respect to internal controls, the Company made the following representations:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on the evaluation performed, our management concluded that the Company's internal control over financial reporting was effective as of December 31, 2010.

63. Defendants further represented that they had conducted a proper evaluation of internal controls under Rule 13a-15(b) and that internal controls "were effective as of December 31, 2010." Specifically, the Company represented:

Pursuant to Rule 13a-15(b) under the Securities Exchange Act of 1934 ("Exchange Act"), the Company carried out an evaluation, with the participation of the Company's management, including the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") (the Company's principal financial and accounting officer), of the effectiveness of the Company's disclosure controls and procedures (as defined under Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report. Based upon that evaluation, *the Company's CEO and CFO concluded that the Company's disclosure controls*

21

*and procedures were effective as of December 31, 2010 to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Exchange Act, is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including the Company's CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.*

[Emphasis added.]

64.    On March 14, 2011, SinoHub also issued a press release touting its 2010 increase in revenues.  The Company stated:

ECSS revenues, consisting of procurement-fulfillment, spot component sales and supply chain management services, grew 5.5% to $135.5 million for 2010 from $128.4 million in 2009, and were driven by the Company's ability to leverage, economies of scale and purchasing power from suppliers while meeting manufacturer customers sourcing needs with preferential pricing and enhanced inventory management. We anticipate increased demand for supply chain management services in 2011 originating from new design house customers.  ICM revenues were $61.2 million due to robust demand for mobile phones from customers in developing countries.

\* \* \*

*For full fiscal year 2011, SinoHub is providing revenue guidance of $255 million, representing anticipated year-over-year growth of 30% over 2010.*

[Emphasis added]

65.    In the same press release, Defendant Cochran stated:

We are pleased with our financial performance during the fourth quarter and full year 2010.  We achieved a significant milestone by meeting our 1 million phones production goal as we generated over $60 million in ICM sales from a business which began just over one year ago.  We continue to leverage the information exchange between our two business segments to provide integrated solutions to customers operating in the electronic marketplace. We are extremely enthusiastic about continued growth in our ICM business and expect to produce over 3 million phones in 2011, with a meaningful portion expected to come from sales of higher priced, higher margin smart phones.

66.    Defendant Xia also promised that 2011 would be a lucrative year for SinoHub:

During the past year I have led the sales efforts for our ICM business and am convinced that we entered the market at an opportune time. With a higher handset replacement rate in developing countries and private label phone manufacturers continuing to gain market share, we believe we are well positioned to participate in the robust growth currently taking place in the emerging markets. Securing our first smart phone orders was a significant milestone and provides us the opportunity to fully leverage the online joint design capabilities we developed for our clients, while producing higher priced, higher margin phones. We secured orders from customers such as China Unicom, which had 166 million subscribers, including 12.8 million 3G subscribers, at the end of 2010, and HT Mobile in Indonesia, which sells between 500,000 and 600,000 phones per month, which we believe validates our business model and puts us on a path to secure much larger orders and drive incremental growth during 2011.

67.     The aforementioned statements were false and/or misleading because they failed to disclose that:

- SinoHub's officers and managers did not have sufficient knowledge of U.S. GAAP in order to adequately comply with SEC regulations;

- SinoHub's internal controls were not effective;

- the Company had failed to properly record the common stock purchase warrants in connection with a March 2, 2010 private placement, in violation of Accounting Standards Codification 815-40, *Derivatives and Hedging – Contracts in Entity's Own Equity*;

- the Company failed to properly record the revenues of its electronic component parts business in violation of ASC Topic 605, *Revenue Recognition*;

- the Company had a significant customer concentration in its ICM business that posed substantial risks; and

- the ICM business would not contribute sustainable revenue growth in the future.

68.     On March 16, 2011 SinoHub filed a prospectus supplement pursuant to the "shelf" registration statement, Form S-3, which was filed with the SEC on January 5, 2011 and declared effective on January 12, 2011. SinoHub offered 4,791,097 shares of stock, and warrants to purchase up to 1,437,329 shares of common stock to selected institutional investors through a registered direct offering. SinoHub retained Rodman & Renshaw LLC to act as the placement agent in connection with this offering.

69.     The prospectus supplement incorporated by reference the following documents:

- SinoHub's Annual Report on Form 10-K for the year ended December 31, 2010 filed with the SEC on March 14, 2011
- SinoHub's Form 8-K filed with the SEC January 3, 2011 and January 31, 2011.
- SinoHub's Definitive proxy statement on Schedule 14A relating to the annual meeting of shareholders held on June 24, 2010, as filed with the SEC on April 30, 2010.
- A description of SinoHub's common stock as set forth in its Registration Statement filed on Form 8-A under the Exchange Act on August 4, 2009 as amended in its Current Report on Form 8-K filed on September 28, 2009.

70.     The prospectus supplement stated that "[t]he financial statements incorporated in this prospectus supplement by reference to the Annual Report on Form 10-K for the year ended December 31, 2010 have been so incorporated in reliance on the report of Baker Tilly Hong Kong Limited, an independent registered public accounting firm, *given on the authority of said firm as experts in auditing and accounting*." [Emphasis added].  Further, BTHK consented to the incorporation of its audit report for the year 2010 in the Company's Registration Statements.

71.     On March 21, 2011, SinoHub announced that it had completed its registered direct offering. The Company's common stock was sold at $2.30 per share and each purchaser received a warrant to purchase .3 shares of common stock for each share of common stock that it purchased in the offering.  The Company raised approximately $11 million in this offering.

72.     On May 16, 2011, the Company filed its Form 10-Q for the first quarter (signed by Defendants Cochran and Li).  Investors, including those who only two months earlier had purchased stock and warrants in the registered direct offering were shocked when the Company admitted: (1) that its previously filed Form 10-K for 2010 and Form 10-Qs for all quarters in 2010, which were incorporated into the prospectus supplement, could no longer be relied upon due to a material misstatement regarding accounting for warrants and would have to be restated; and (2) that its internal controls were not effective as of the year ended December 31, 2010.  As a

result of these disclosures, SinoHub's stock price dropped from an opening price of $1.76/share

to a closing price of $1.36/share, a drop of *23%* in one trading day.

73.     In its Form 10-Q, the Company reported the following regarding its profitability:

> Net sales for three months ended March 31, 2011 were $38.0 million, down 1.6%
> from $38.6 million in the year-earlier period. In three months ended March 31,
> 2011, net sales of ECSS business segment decreased to $21.5 million from $32.2
> million in the year-earlier period. In three months ended March 31, 2011, net
> sales of ICM business segment increased 156% to $16.4 million from $6.4 million
> in the year-earlier period.

> * * *

> The first fiscal quarter is historically the slowest fiscal quarter of each year, and
> quarterly results fluctuate significantly from quarter to quarter. Based on these
> facts and the Company's continuing focus on its ICM business as a larger
> component of overall operations, the Company does not believe that net sales for
> the three months ended March 31, 2011 are necessarily indicative of future
> performance or any trends but continues to evaluate its results of operations on a
> quarterly basis going forward. Net margins improved to 9.3% for the three
> months ended March 31, 2011 compared to 8.9% in the year-earlier period."

> * * *

> In light of the strong growth opportunities in SinoHub's ICM business segment
> and its strengthened working capital position as a result of its recently reported
> $11 million equity raise and existing bank facilities, SinoHub remains confident
> in the Company's fundamentals, strategy, and prospects.

74.     These statements were false and misleading because the Company was

misreporting revenue from its ECP business and was misleading investors into believing that its

ICM business was going to be extremely profitable. Furthermore, the Company failed to

disclose that its officers and managers lacked adequate knowledge of U.S. GAAP, which

constituted a material weakness in internal control over financial reporting.

75.     In its amended Form 10-K, filed on May 24, 2011, the Company specifically

discussed its failure to properly account for warrants, stating:

> In 2010, the Company did not properly assess the impacts of certain non-standard
> anti-dilution provisions that existed in stock purchase warrants issued in a March

2010 offering requiring an adjustment to the exercise price of the warrants in the event the Company issues common stock, or securities convertible into or exercisable for common stock, at a price per share lower than such exercise price, resulting in equity (versus liability) treatment and classification for the warrants.

\* \* \*

ASC 815-40, formerly EITF 07-05, which was effective as of January 1, 2009, should have been applied resulting in a reclassification of the warrants as a liability, measured at fair value, with changes in fair value recognized as part of other income or expense for each reporting period thereafter.

76.    The Company also admitted, in connection with the restatement, that management had reassessed the effectiveness of its internal control over financial reporting and concluded that the Company's internal control over financial reporting "was not effective as of December 31, 2010, because of a significant deficiency relating to the accounting for equity-linked financial instruments, specifically for stock purchase warrants."  The Company further stated that, "[t]his significant deficiency resulted in a material misstatement of our liabilities, non-cash expense relating to the changes in fair value of derivative liabilities and equity accounts and related financial disclosures that was not prevented or detected on a timely basis."

77.    On July 27, 2011, Defendant Cochran granted the deed to his house in Hull, Massachusetts, the location of the former principal office of SinoHub, to his wife, Linda M. Hetue.

78.    On August 15, 2011, the Company filed its Form 10-Q for the second quarter of 2011 (signed by Defendants Cochran and Li).  The Company reported the following:

In the three months ended June 30, 2011, net sales of ECSS business segment increased 3.7% to $31.7 million from $30.6 million but net sales of ICM business segment decreased 31% to $9.2 million from $13.3 million in the year-earlier period.  The primary reason for the decrease in ICM net sales was that a major customer had to drastically cut back on orders with SinoHub in the second quarter.

\* \* \*

26

The Company will soon start the process of shifting the electronic component procurement (ECP) portion of our ECSS segment . . . to a brokerage model from our current model where we take ownership of components. This will result in much lower revenue (the Company will only be able to record commissions as revenue instead of the full value of the components), but much higher gross margins.

79.     On August 15, 2011, the Company filed a Form 8-K and press release, which provided the following full year 2011 guidance:

As announced, the Company experienced a significant reduction in revenue in the second quarter due to the fact that its largest ICM segment customer experienced inventory issues with another supplier which caused the customer not to purchase products from the Company during the second quarter. In addition, the Company expects to generate lower ECSS segment revenues moving forward as a result of its strategic decision to shift the electronic component procurement (ECP) portion of its ECSS segment to a brokerage model. Finally, although the Company believes its ICM business model is now proven, it has not been able to expand its customer base as quickly as planned. As a result of the foregoing, the Company now expects to sell approximately 2.5 million mobile phones in 2011, down from its previous estimate of 3 million, and it expects full-year 2011 revenue of approximately $195 million, unchanged as compared to the full-year 2010. This compares to the Company's previously issued guidance of $255 million for the full-year 2011.

80.     These statements were false and misleading because SinoHub was misreporting its revenues from its ECP business. SinoHub did not, in fact, previously take ownership of components before selling them to customers, which led to inappropriately accounting for revenues. Further, SinoHub's disclosure that it lost its largest ICM customer only confirms that the Company never had an established customer base or a growing pipeline of new customers.

81.     Even though the Defendants were continuing to deceive the market, upon learning that the Company would no longer reach its $255 million revenue goal for full year 2011 and that its ICM business was not as lucrative as promised, SinoHub's stock price dropped from a closing price of $1.05 per share on the last trading day before the announcement to a closing price of $0.80 per share on August 15, 2011, *a drop of 24%.*

27

82.    On November 14, 2011, the Company filed its Form 10-Q for the third quarter

(signed by Defendants Cochran and Li).  The Company reported the following:

> Net sales for three months ended September 30, 2011 were $51.97 million, down
> 6.8% from $55.75 million in the year-earlier period.  In the three months ended
> September 30, 2011, net sales in the ECSS business segment decreased 4.4% to
> $35.11 million from $36.73 million in the year earlier period, and net sales in the
> ICM business segment decreased 11.4% to $16.86 million from $19.02 million in
> the year-earlier period.  The primary reason for the decrease in the ECSS business
> segment was the increasing maturity of the 2G handset market and the lack of
> clear leadership in the 3G handset market which resulted in fewer arbitrage
> opportunities as potential customers are better able to match demand and supply
> in the 2G market and the lack of a leader in the 3G market has limited demand
> and arbitrage opportunities in that market. ICM net sales declined because the
> Company was not successful in replacing all of the revenue that was lost when a
> major customer had to drastically cut back on orders with SinoHub starting in the
> second quarter of 2011.

83.    On November 14, 2011, the Company filed a Form 8-K and press release

discussing guidance for the full year 2011, and stated:

> Our results for the third quarter were largely in line with our expectations, as we
> continued to be impacted by the decline in ICM revenue following the cut back in
> orders from a major customer in the second quarter. While we have not yet
> replaced all of the revenue lost from this key customer, our results have stabilized
> thanks to our progress on the business development front. In fact, we have
> successfully broadened our base of smaller ICM customers placing higher margin
> orders, which led to an improvement in our ICM gross profit margin from the low
> in the previous quarter.

> \* \* \*

> While we may continue to face near-term pressure in the short term, we remain
> confident that our rate of growth in the ICM business segment will rebound in the
> year ahead.

> \* \* \*

> The process to shift the electronic component sales part of our ECSS segment to a
> brokerage model is ongoing, and we expect to make further progress here in the
> fourth quarter of 2011. This transition is necessary as we continue to focus our
> resources on developing our ICM business segment.

> \* \* \*

As of September 30, 2011, inventories were approximately US$37.1 million and accounts receivable were US$60.2 million, compared to approximately US$14.6 million and US$45.7 million on December 31, 2010, respectively. The increase in inventory was related to our ICM business and the increase in accounts receivable resulted from lower collections in ECP in the quarter caused by a change in policy by the Chinese banks which had the effect of lowering credit availability for our customers.

84.     These statements were false and misleading because SinoHub: (1) was inappropriately reporting revenue on sales where collection was not reasonably assured, resulting in inflated accounts receivable numbers; (2) failed to disclose that the Company was not receiving any collections from customers before those customers were paid by their own customers; and (3) failed to increase its allowance for doubtful accounts even though the risk of non-collection had significantly increased.

85.     Additionally, based on the Company's prior statements regarding the profitability of the ICM segment, the Company's guidance for full year 2011 was false and misleading.  The Company had previously stated that the ICM business contributed $60 million in 2010, with the sale of just over 1 million mobile phones.  At this time, full year revenue guidance was $255 million, with an anticipated 3 million mobile phone sales, or approximately $180 million contributed from the ICM business, leaving $75 million to be contributed from the ECSS business.  On August 15, 2011, SinoHub revised guidance downward to $195 million, with only 2.5 million mobile phones to be sold, or approximately $150 million contributed from the ICM business, leaving approximately $45 million to be contributed from the ECSS business to reach its new guidance of $195 million.  However, the Company also indicated that it had to lower its price points for its ICM business and would be earning less revenue from its ECSS business. Despite this fact, on March 30, 2012, the Company reported ECSS revenue of $105.1 million for the year.  Thus, the Company reported revenue far in excess of its original and reduced estimate,

despite having told the market that the ECSS business was declining. This raises a strong inference that the ECSS numbers that were ultimately reported were false.

86.    On November 22, 2011, the SEC began raising questions regarding SinoHub's SEC filings, including its Form 10-K for the year ending December 31, 2010 and Form 10-Qs for quarters ending March 31, 2010, June 30, 2010, and September 30, 2010. The SEC inquiry specifically focused on the Company's ineffective internal controls for financial reporting and revenue recognition practices.

87.    On December 14, 2011, the Company responded to the SEC's questions (in bold italics), stating the following:

> *Staff Comment 2: We note your disclosure here that management concluded that your internal control over financial reporting was not effective because of a significant deficiency relating to the accounting for equity-linked financial instruments. Please address the following:*
> - *Provide us with additional details to support your conclusion that the control deficiency is a significant deficiency and not a material weakness. In this regard, we note that the deficiency resulted in a material misstatement of the annual and interim financial statements not being prevented on a timely basis.*
> - *Your current disclosure appears to suggest that the deficiency relates solely to your accounting for these warrants. However, it appears that the control deficiency could be more pervasive and relate to your ability to account for complex transactions in accordance with U.S. GAAP.*
>
> *Please explain to us in greater detail the nature of the actual control deficiency identified.*
>
> Management concluded that our failure to properly account for equity-linked financial instruments was a significant deficiency, but not a material weakness, because it was related to a non-cash item concerning the specific treatment of certain warrants. In 2010, due to human error the Company did not properly assess the impact of certain non-standard anti-dilution provisions that existed in stock purchase warrants issued in a March 2010 offering requiring an adjustment to the exercise price of the warrants in the event the Company issued common stock, or securities convertible into or exercisable for common stock, at a price per share lower than such exercise price, resulting in equity (versus liability) treatment and classification for the warrants. We do not believe that the deficiency is pervasive and we do not think that it indicates an inability to account

for complex transactions in accordance with US GAAP. We believe this was an isolated incident and we will carefully consider any future potential issue should we enter into a complex transaction.

*Staff Comment 3: We note that you conduct substantially all of your operations outside of the United States. In order to enhance our understanding of how you prepare your financial statements and assess your internal control over financial reporting, we ask that you provide us with information that will help us answer the following questions.*

*How do you evaluate and assess internal control over financial reporting?*

* * *

*How do you maintain your books and records and prepare your financial statements?*

* * *

*Who is involved in your financial reporting?*

* * *

*Do you have an audit committee financial expert?*

* * *

The Company's internal control over financial reporting is a process designed by our chief financial officer (CFO) and reviewed by our Audit Committee to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external purposes. All of our sales, purchases and payments are approved by our CFO and checked by our accounting manager. We follow the SEC financial reporting guidelines to prepare our financial statements. The Company's books and records are maintained in accordance with U.S. GAAP.

The CFO is the primary person who monitors the preparation of books and records that are kept by accountants in our Finance Department.

* * *

Mr. Li has five years experience with U.S. GAAP. He learned U.S. GAAP after extensive experience with Chinese GAAP through self study and working with external resources. Mr. Li also has attended in the past and will attend in the future the SEC update courses held by CPE in Shanghai, China when time permits from his schedule.

In 2009 the Company engaged MJS Consulting a consulting firm staffed with US certified public accountants based in Portland, Oregon and Hong Kong, to ensure compliance with Sarbanes/Oxley 404 and assess the effectiveness of our controls and policies then in place. During the past 2 years, the Company has refined and

31

improved its controls over financial reporting based on the recommendations of MJS Consulting.

In addition to our CFO, our accounting manager has 20 years of experience in accounting. Also, the Company has an internal audit function and our internal audit manager has 11 years of experience in accounting. Our accounting manager and internal audit manager learned U.S. GAAP through self study and from our CFO.

The Company neither retains an accounting firm or similar organization to prepare its financial statements nor individuals who are not our employees and are not employed by an accounting firm or other similar organization to prepare our financial statements or evaluate our internal control over financial reporting.

Mr. Lui [Audit Committee expert] served as CFO and a director of China Digital Media Corporation, a company listed on the OTCBB, from 2004 to 2006 where Mr. Lui was responsible for the preparation and review of US GAAP-compliant financial statements and assisted with the implementation of financial and internal control systems to achieve compliance with applicable regulatory listing requirements. From 2006 to the present, Mr. Lui has served as the chief executive officer for Porcheers Consultants Limited which provides consulting services to US listed companies with respect to establishing internal controls to comply with the requirements of Section 404 of the Sarbanes-Oxley Act.

***Staff Comment 6: Further to the above, please tell us more regarding how you recognize revenues for your supply chain management services. Explain the components of the revenue you recognize from these services. Also explain the direct costs relating to these services. Provide us with a walkthrough of your accounting for the inventory for which you provide these services, including clarifying whether this inventory was manufactured by you, a related party entity or an independent third party.***

Revenues for supply chain management (SCM) services are earned from both the logistics services and procurement-fulfillment programs provided. We recognize revenues for our SCM services when services are provided. The components of SCM service revenue are: delivery services, import/export services, warehouse services and a number of ancillary services and are primarily based on a percentage of inventory value handled for a customer. Cost of sales for SCM services primarily represents direct costs incurred for providing SCM services such as transportation, kitting, insurance, repackaging and re-labeling.

Cost of sales for SCM services does not include cost of inventory. <u>For electronic component sales, we purchase electronic components from independent third parties and hold them in inventory, valued at cost, until they are shipped to our</u> customers.

[Underline emphasis added.]

*Staff Comment 9:  We note the significance of your accounts receivable at September 30, 2011. Please explain to us the factors that led to the increase in your accounts receivable in light of the declining sales in the quarter. In this regard, it appears your days sales outstanding has grown from approximately 85 days at December 31, 2010 to approximately 116 days at September 30, 2011. Discuss the factors contributing to this increase. Also discuss the typical payment terms that you offer to customers and explain the factors you consider in determining your allowance for doubtful accounts.*

The primary factor that led to the increase in accounts receivable in the quarter ended September 30, 2011 was the fact the Chinese banks tightened credit on loans to small and medium size enterprises (SMEs), which made it more difficult for companies that rely on loans to address short-term cash flow problems to obtain such loans. As an example, we have a customer in Shanghai to whom we have been selling electronic components and providing supply chain management services for over four years. They sell primarily to large corporations and government agencies which pay them once a year. In the past, they used bank borrowings to obtain operating capital while waiting for the annual payments from their customers, but this year that credit has not been available so the amount of receivables from this account is much greater than in the past. We believe that we will collect this money, but this year we will have to wait until they get paid by their customers. We offer clients to whom we sell electronic components 30 to 180 day payment terms. Extended terms, which we consider to be beyond 60 days, are given based on the financial condition and our sense of the creditworthiness of each individual customer. In determining our allowance for doubtful accounts, we consider the current financial condition, the past payment record and length of our relationship with our customers. We also consider whether or not there are any special circumstances that currently affect the ability of our customers to pay on time and the likelihood that any such circumstance with persist.

88.     The SEC again wrote to SinoHub on December 28, 2011, questioning its determination that there were no material weaknesses in internal controls.  On January 12, 2012, the Company responded to the SEC's questions (in bold italic), stating the following:

*Staff Comment 2:  We note your responses to prior comments 2 and 3. A material weakness is defined as a significant deficiency or a combination of significant deficiencies that results in more than a remote likelihood that a*

*material misstatement of the financial statements will not be prevented or detected. Given that you did not have the proper controls in place to properly assess the impact of certain anti-dilution provisions of your warrant agreements and this control deficiency led to material misstatement of your financial statements, it is unclear as to how you concluded the deficiency was anything other than a material weakness. Please advise us or revise your filing accordingly.*

Upon further consideration we have determined that the failure to assess the impact of anti-dilution provisions of the warrants was a material weakness. We will filed amendments to our Form 10-K for the year ended December 31, 2010 and our Form 10-Q for the quarter ended September 30, 2011 promptly following resolution of the balance of the Commission's comments on such filings to reflect this determination and will reflect this determination in subsequent filings, as appropriate.

*Staff Comment 3: Further to the above, you state in your response to prior comment 2 that the control deficiency arose "due to human error." Please explain to us in greater detail the circumstances surrounding the control deficiency. Clarify the "human error" to which you refer by providing us with additional details regarding the cause of the original error. In order to provide context, please also provide us with information as to how the error was discovered subsequent to the filing of the Form 10-K.*

The person responsible for accounting for the warrants we have outstanding overlooked the anti-dilution provision in the warrants. This oversight was discovered during the preparation of our Form 10-Q for the quarter ended March 31, 2011.

*Staff Comment 4: We note the statement in the final sentence of your response to prior comment 2. You state that you will carefully consider any future potential issue should you enter into a complex transaction. Please explain in greater detail what you mean by this statement. In this regard, provide us with details as to what controls you have in place to identify and account for complex transactions as well as what controls you have in place to prevent and detect errors relating to these complex transactions. Discuss how these controls functioned in connection with both the original accounting for the warrants and the accounting in subsequent periods.*

Prior to our discovery of the issue with outstanding warrants during the preparation of our Form 10-Q for the quarter ended March 31, 2011, we did not have a separate step in our review process to ensure all issues surrounding complex transactions had been addressed. Following this discovery we implemented an additional step in our review process to make sure all issues surrounding complex transactions are addressed. We define complex transactions as transactions that may be affected by a subsequent event, such as anti-dilution

34

provisions in securities we issue or transactions which would require a subsequent marking to market of acquired assets In our new process we work to identify complex transactions early in the financial statement preparation process and we developed a checklist of potential issues relating to complex transactions which must be completed internally with respect to any transaction identified as a complex transaction.  We believe that had we had this additional step in place, it would have greatly reduced or eliminated the chance that the anti-dilution provision in outstanding warrants would have been overlooked since in the course of completing the checklist, the reviewer of the warrants would have been required to focus on whether the warrants contained anti-dilution provisions.

*Staff Comment 5:*

\* \* \*

*You state that Mr. Li has five years experience with U.S. GAAP, which was learned through "self study and working with external resources." Please explain this in greater detail. Describe the external resources to which you refer.*

We stated in our response dated December 14, 2011, "In 2009 the Company engaged MJS Consulting a consulting firm staffed with US certified public accountants based in Portland, Oregon and Hong Kong, to ensure compliance with Sarbanes/Oxley 404 and assess the effectiveness of our controls and policies then in place.  During the past 2 years, the Company has refined and improved its controls over financial reporting based on the recommendations of MJS Consulting." and "The Company neither retains an accounting firm or similar organization to prepare its financial statements nor individuals who are not our employees and are not employed by an accounting firm or other similar organization to prepare our financial statements or evaluate our internal control over financial reporting." The principals with whom we dealt in 2009 and the first part of 2010 at MJS were Michael Senzaki (based in Portland, Oregon) and Leslie Chow (based in Hong Kong). Both of these gentlemen are US CPAs with extensive experience working with public companies in the USA. Since the engagement with MJS concluded we have maintained contact with Leslie Chow who is a U.S. GAAP expert for support on U.S. GAAP issues even though we do not retain Mr. Chow to prepare our financial statements or evaluate our internal control over financial reporting.  Mr. Li and Mr. Chow have frequent discussions during which, among other matters, Mr. Chow raises with Mr. Li any new accounting standards that could impact SinoHub's financial reporting.

*You further state that Mr. Li attends SEC update courses held by CPE in Shanghai when time permits from his schedule. Please explain this statement in greater detail.  Describe the frequency with which Mr. Li has attended these courses in the past.  Explain why you believe attendance at these courses provides sufficient knowledge of U.S. GAAP, especially as it relates to complex transactions and new and emerging accounting standards. Finally, discuss*

*what, if any, other training Mr. Li receives in the event his time does not permit him to attend the identified courses.*

Mr. Li attended the course held by Center for Professional Education 2011 SEC Conference: An Accounting & Reporting update for US Listed Companies on June 20th and 21st, 2011 Shanghai, P.R. China. We do not believe that the CPE courses provide sufficient knowledge of U.S. GAAP, but they do provide current information on U.S. GAAP as of the date they are given and therefore are useful. As mentioned above, we rely on Mr. Chow for sufficient knowledge of U.S. GAAP especially as it relates to complex transactions and new and emerging accounting standards and Mr. Chow updates Mr. Li on relevant changes to the accounting standards on a frequent basis.

*Staff Comment 8: We note your response to prior comment 9. You state that due to the credit tightening, for some customers you will now have to wait until your customer is paid by its customer before you will collect payment. Explain how you have considered this fact in your evaluation of whether the 'collectability' criteria for revenue recognition has been met. Clarify if you defer recognition of revenue on these sales until payment is received from the end customer. If you do not defer recognition of revenue, explain how you reached a conclusion that revenue recognition was appropriate.*

Our credit department is vigilant to ensure that during this period of tight credit we only ship goods to companies from which they are confident we will receive payment. The customers for whom the credit tightening meant a delay in payment are all long term customers who have good payment records. We believe it makes business sense for us to provide extended payment terms to these customers to tie to their payment cycle with their end customers during this period of tight credit. However, we do <u>not</u> condition our customer's obligation to pay us on their receipt of payment from their customers. Also, we believe that the credit tightening is a short-term phenomenon and therefore we view the extended terms as a temporary accommodation. For these reasons, we concluded that the receivables thus affected are collectable. Also, because we believe the credit tightening will not be long lasting, we decided not to deviate from our long standing policy of recognizing revenue from component sales when the goods are shipped and the customer is invoiced. We believe that revenue recognition at the time of shipment and invoicing is appropriate because we are dealing with long standing customers who had good payment records under normal credit conditions and we see a return to normal credit conditions within six months.

89.    On January 30, 2012, the SEC again pressed SinoHub to provide more information regarding its internal controls and revenue recognition.   On February 3, 2012, the Company responded to the SEC's questions (in bold italic), stating the following:

36

***Staff Comment 3:  We note from your response to prior comment 8 that due to current credit conditions you have offered extended payment terms to certain customers so that they can tie their payment cycle with their end customers. Given that this accommodation was made to allow your customers to collect from their end customers it is unclear why you believe that collectability of these sales was reasonably assured at the time of the sale. Please explain to us the process you undertook at the time of the sale to determine that your customers would be able to sell your products and collect the related receivable to their end customers.***

As we noted in our response to prior comment 8, the payment obligations of our customers to us are not conditioned on our customers being paid by their end customers. To clarify, at the time of sale we also reasonably expect that our customers who are granted extended payment terms will pay within those terms independent of any particular collection cycles which our customers may experience in collecting their own receivables.  As we noted in our prior response, "we believe that the credit tightening is a short-term phenomenon and therefore we view the extended terms as a temporary accommodation." We are in a competitive marketplace and so we believe that we can be more competitive by permitting certain of our customers to be granted more favorable terms that will accommodate the slower pace of collections and/or longer payment terms that they may have experienced in recent periods.  As indicated in our prior response, we have limited the extended credit terms to "long term customers who have good payment records." Our customary credit approval process continues to be applied.  We use the customer's business license in China to obtain information in order to conduct research on each customer annually, unless there is a payment problem, in which case we repeat the process sooner, with information from the tax bureau and other related institutions. We have our own rating system which uses this information together with information from past experience with the customer, checks with the end customers of our customer and the length of our relationship to derive a score that translates into our credit rating. We use this rating to determine whether to provide the customer with more favorable payment terms.  It is also our understanding that the primary end customers of some of our customers who enjoy extended payment terms from our customers are government agencies or other large entities that are not likely to fail but which in turn have the leverage to negotiate favorable payment terms with our customers.  In summary, we believe at the time of sale that sales of our products, even to those who enjoy extended terms, will be fully collectible. Thus far, we have not experienced default rates with respect to the extended payment terms that are significantly greater than defaults under the prior payment terms.

90.    On February 28, 2012, in response to the SEC's questioning, SinoHub filed amended Form 10-K for 2010 and an amended Form 10-Q for the quarter ended September 31,

2011.   The amended filings revised the Company's disclosures related to internal controls to

reflect the following:

> Pursuant to Rule 13a-15(b) under the Securities Exchange Act of 1934 ("Exchange Act"), the Company carried out an evaluation, with the participation of the Company's management, including the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") (the Company's principal financial and accounting officer), of the effectiveness of the Company's disclosure controls and procedures (as defined under Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report. *Based upon that evaluation, and taking the matters described above into account, including the determination that, as described below, there was a material weakness in our internal control over financial reporting caused by a lack of personnel with sufficient knowledge of US GAAP which resulted in the inaccurate accounting for certain stock purchase warrants, the Company's CEO and CFO concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2010* to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Exchange Act, is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including the Company's CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

> \* \* \*

> In connection with the restatement discussed above and in Note 2 to our financial statements in this Form 10-K/A, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation to reassess the effectiveness of our internal control over financial reporting based on the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on the evaluation performed, our *management concluded that the Company's internal control over financial reporting was not effective as of December 31, 2010, because of a material weakness in the internal controls caused by a lack of personnel with sufficient knowledge of US GAAP which, in this instance, led to inaccurate accounting for equity-linked financial instruments, specifically for stock purchase warrants.* This material weakness resulted in a material misstatement of our liabilities, non-cash expense relating to the changes in fair value of derivative liabilities and equity accounts and related financial disclosures that was not prevented or detected on a timely basis. The material weakness described above resulted in a restatement of the Company's financial statements as discussed below and in Note 2 to the financial statements included in this Annual Report on Form 10-K/A.

* * *

**Remediation Plan**

Management has been actively engaged in developing a remediation plan to address the material weakness that was identified. Implementation of the remediation plan is in process and consists of redesigning quarterly procedures to enhance management's identification, capture, review, approval and recording of contractual terms included in equity arrangements. Management is also considering additional steps, which may ultimately include greater use of the consultant currently engaged by the Company to advise on US GAAP and other matters, additional US GAAP training for the Company's existing staff and/or hiring additional staff with a more expansive background in US GAAP. Management believes the foregoing efforts will effectively remediate the material weakness. As the Company continues to evaluate and work to improve its internal control over financial reporting, management may execute additional measures to address potential control deficiencies or modify the remediation plan described above. Management will continue to review and make necessary changes to the overall design of the Company's internal control environment, as well as to policies and procedures to improve the overall effectiveness of internal control over financial reporting.

[Emphasis added.]

91.     SinoHub's responses to the SEC comment letters and subsequent restatements demonstrate that the Company's prior financial statements, submitted on its 2010 Form 10-K and Form 10-Qs, 2011 Form 10-K and its Form 10-Q for the quarter ended September 30, 2011, were false and misleading and violated U.S. GAAP.

92.     On March 30, 2012, SinoHub filed its Form 10-K for 2011, signed by Defendants Cochran, Li, Xia, and Lui, as well as directors Jeff Qi He and Ted Liangche Shen.   The representations in the SOX certifications for the 2011 Form 10-K were the same as those in the 2010 10-K.   SinoHub's auditor, BTHK, issued a clean audit opinion representing that the Company's financial statements presented fairly, in all material respects, the financial position of SinoHub and its subsidiaries as of December 31, 2010 and 2011, and its operations and cash flow, were presented in conformity with U.S. GAAP.

93.     In its 2011 Form 10-K, SinoHub made the following representations:

The Company reported net income for the year ended December 31, 2011 of $6.7 million compared to $19.7 million in 2010, a decrease of 66%. Net sales for the year ended December 31, 2011 were $196.2 million, roughly equivalent to the $196.7 million recorded in 2010. In the year ended December 31, 2011, net sales of the ECSS segment decreased 22.4% to $105.1 million from $135.5 million in 2010. In the year ended December 31, 2011, net sales of the ICM segment increased 48.9% to $91.1 million from $61.2 million in 2010. Over half of the sales in the ICM segment for 2011 were recorded in the fourth quarter marking substantial recovery in sales volume from the loss of our largest customer in early 2011, which led to a low level of sales in the second and third quarters.

\* \* \*

Due to the Company's lack of success in implementing a higher margin brokerage model for its ECSS business, the Company intends to deemphasize the electronic component sales aspect of its ECSS business over time and to focus on improving margins in ICM.

94.   Regarding disclosure controls and internal controls, the Company stated:

Pursuant to Rule 13a-15(b) under the Securities Exchange Act of 1934 ("Exchange Act"), the Company carried out an evaluation, with the participation of the Company's management, including the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") (the Company's principal financial and accounting officer), of the effectiveness of the Company's disclosure controls and procedures (as defined under Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report. Based upon that evaluation, and taking the matters described above into account, including the determination that, as described below, there was a material weakness in our internal control over financial reporting at December 31, 2010, the Company's CEO and CFO concluded that (i) the Company has remediated the material weaknesses in internal control over financial reporting relating to the accounting for stock purchase warrants, as described in Item 9A of our Amended Annual Report on Form 10-K/A for the fiscal year ended December 31, 2010 and (ii) *the Company's disclosure controls and procedures were effective as of December 31, 2011* to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Exchange Act, is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including the Company's CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

\* \* \*

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation to assess the effectiveness of our internal control over financial

40

reporting based on the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on the evaluation performed, our management concluded that (i) the Company has remediated the material weaknesses in internal control over financial reporting relating to the accounting for stock purchase warrants, as described in Item 9A of our Amended Annual Report on Form 10-K/A for the fiscal year ended December 31, 2010 and (ii) *the Company's internal control over financial reporting was effective as of December 31, 2011.*

[Emphasis added].

95.    On March 30, 2012, the Company filed a Form 8-K and issued a press release discussing fourth quarter and full year earnings and providing guidance for 2012:

> Total net sales increased year-over-year to US$65.3 million in the fourth quarter of 2011 compared to US$58.5 million in the fourth quarter of 2010. Total net sales were US$196.2 million, roughly equivalent to the $196.7 million recorded in 2010.

> \* \* \*

> The Company is providing full-year 2012 revenue guidance of approximately $200 million, compared to $196.2 million for the full-year 2011 as growth in our ICM business is offset by a decline in our ECSS business.

96.    The foregoing statements were knowingly or recklessly false and misleading because SinoHub did not have effective disclosure controls and procedures. Indeed, there were *material weaknesses* in the Company's internal controls, including:

> a.    The Company's personnel, including the CEO, CFO, and Audit Committee Financial Expert lacked expertise in U.S. accounting principles;
>
> b.    The Company did not maintain quarterly internal control procedures to identify, capture, review, approve and record contractual terms included in equity arrangements;
>
> c.    The Company did not maintain appropriate segregation of duties related to key control points, such as cash, bank statements, sales, accounts receivable, inventories, purchase orders, accounts payable, bank deposits, bank disbursements and payroll;
>
> d.    The Company and its CEO failed to exercise control over the Company's bank accounts; and

e.      The audit committee failed to exercise sufficient authority to supervise and fund the Company's independent auditors and outside consultants.

97.     Further, these statements were false and misleading because Defendants knew that they were improperly recording revenues from their ECCS and ICM divisions.

98.     On March 30, 2012, the Company reported ECSS revenue of $105.1 million. This was far in excess of the approximately $75 million in ECSS revenue projected at the beginning of the year, which was later reduced when the Company told the market it had switched to a brokerage model that produced less revenue. The discrepancy between these numbers provides further support that Defendants were knowingly or recklessly making false and misleading statements regarding recorded revenue and revenue projections.

99.     On May 15, 2012, SinoHub filed its Form 10-Q for the first quarter of 2012 (signed by Defendants Cochran and Li), representing the following:

> The Company reported a net loss for the three months ended March 31, 2012 of $2.2 million compared to net income of $3.5 million in the year-earlier period. The change is due in large part to the loss of a significant customer that was a source of high margin business and a substantial increase in the Company's provision for bad debts to $1.6 million from $52,000 in the year-earlier quarter based on the Company's assessment of collection trends and market conditions. The first fiscal quarter is historically the slowest fiscal quarter of each year, and quarterly results fluctuate significantly from quarter to quarter. Based on these facts and the Company's continuing focus on its ICM business as a larger component of overall operations, the Company does not believe that results for the three months ended March 31, 2012 are necessarily indicative of future performance or any trends but continues to evaluate its results of operations on a quarterly basis going forward.

> * * *

> Net sales for three months ended March 31, 2012 were $61.8 million, up 62.7% from $38.0 million in the year-earlier period.

> * * *

42

In three months ended March 31, 2012, net sales of the ECSS business segment decreased to $13.8 million from $21.5 million in the year-earlier period as the Company continued to shift its focus to ICM. In three months ended March 31, 2012, net sales of the ICM business segment increased 191.8% to $48.0 million from $16.4 million in the year-earlier period.

100.     Moreover, the Company continued to falsely represent that its internal controls were effective:

Pursuant to Rule 13a-15(b) under the Securities Exchange Act of 1934 ("Exchange Act"), the Company carried out an evaluation, with the participation of the Company's management, including the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") (the Company's principal financial and accounting officer), of the effectiveness of the Company's disclosure controls and procedures (as defined under Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report. Based upon that evaluation, the Company's CEO and CFO concluded that the Company's disclosure controls and procedures were effective as of March 31, 2012 to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Exchange Act, is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including the Company's CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

101.     On May 15, 2012, in its press release, the Company reiterated its financial performance and provided updated guidance for the full year 2012, stating:

Our results for the quarter demonstrate both the continuing challenges that we face following the loss of our largest ICM customer in the second quarter of 2011 and the progress that we have made in the strategic repositioning of SinoHub as a custom mobile device manufacturer operating on a global basis. Our top line grew significantly in the first quarter but our bottom line continued to be impacted by the lower-margin business we accepted in order to utilize our capacity in the wake of the loss of certain higher margin business we had originally expected. This continues to be a challenge for us. Market conditions in our ECSS business are also challenging as margins have continued to suffer from intense competition and fewer profitable arbitrage opportunities. With the growth in sales and the resulting growth in receivables in the first quarter in a challenging economic environment, we assessed our accounts receivable and increased our bad debt reserve, which was the primary contributor to our loss for the quarter. However, we are pleased to see the continued expansion of our ICM customer base and significant growth in ICM revenue. ICM accounted for approximately 77.6% of our total net revenues for the first quarter, a significant increase on a sequential

43

and year-over-year basis. As we have previously announced, we are strategically realigning our business by de-emphasizing the ECSS business segment due to the long-term structural challenges in that market, while placing greater focus on the development of our ICM segment, the global market for which is expected to continue growing at a healthy rate. We believe that a key challenge for us is to generate sales opportunities and scale which will allow us to improve our margins.

* * *

The Company reconfirms its previously given full-year 2012 revenue guidance of approximately $200 million, compared to $196.2 million for the full-year 2011, with the expectation of continued growth in our ICM business accompanied by a continued decline in our ECSS business.

102.   The market reacted negatively to the revelation that the Company had been inadequately reserving for bad debts. Indeed, through the third quarter of 2011, the Company had only recorded bad debt reserves of $128,000 for the nine months ending September 30, 2011, even though it reported accounts receivable of $61,011,000 at quarter end on September 30, 2011. On May 15, 2012, SinoHub's stock price opened at $0.59/share and by close of the market on May 16, 2012, SinoHub's stock price had dropped to $0.46/share on unusually high trading volume, a drop of 22%.

103.   However, SinoHub's stock continued to remain inflated because Defendants continued to make false and misleading statements regarding revenue from ECP sales and the future growth of its ICM business. Further, the Company's internal controls were not effective because the Company's officers, management, and audit committee financial expert did not have sufficient knowledge of U.S. GAAP to prepare financial statements or analyze the effectiveness of internal controls.

**The Truth Is Finally Revealed**

104.   On August 14, 2012, the Company shocked the market when it announced that it was unable to file its Form 10-Q for the quarter ended June 30, 2012 within the prescribed time

period, and that the Company expected to file the report within the extension period. Specifically, the Company stated:

> SinoHub, Inc. (the "Company") was unable to compile the requisite financial data and other narrative information necessary to prepare complete financial statements to be included in the quarterly report on Form 10-Q for the quarter ended June 30, 2012, and is unable to file the periodic report within the prescribed time period without unreasonable effort or expense. The Company expects to file the report within the extension period.

105.    In the three trading days following the announcement, SinoHub's stock price dropped from $0.27 per share to $0.20 per share, a drop of 26%.

106.    On August 21, 2012, the end of the Class Period, SinoHub issued a press release announcing that it would not file its Form 10-Q within the extended period as a result of a delay in the Company's retrieval of information requested by the Company's auditor, BTHK, to confirm prior period sales associated with SinoHub's ECP business.

107.    In its press release, SinoHub discussed preliminary and unaudited results for the quarter ended June 30, 2012, stating that revenues were only $22.6 million and that the Company had suffered a net loss of $2.7 million.   In the three days following the announcement, SinoHub's stock price dropped from $0.20/share to $0.16/share, a drop of 20%.

### Post-Class Period Events

108.    On September 12, 2012, SinoHub announced the resignation of its independent auditor, BTHK, and stated:

> On August 31, 2012, Baker Tilly Hong Kong Limited ("BTHK") verbally informed SinoHub, Inc. (the "Registrant"), a Delaware corporation, that it would cease its provision of audit services to the Registrant with immediate effect. BTHK formally resigned as the registered independent public accountant of the Registrant by letter to the Audit Committee of the Registrant dated September 6, 2012. In its letter of resignation, BTHK indicated that it had resigned as a result of the Registrant's inability to provide sufficient documentation to complete the review of the Registrant's unaudited consolidated financial statements for the period ended June 30, 2012.

45

* * *

In connection with the review of the unaudited consolidated financial statements of the Registrant for the period ended June 30, 2012, BTHK indicated that it did not receive sufficient documentation from the Registrant to be able to confirm that certain so-called spot sales (sales made in connection with trading of electronic components) made by the Registrant satisfied the criteria for revenue recognition under the applicable accounting standards. BTHK further indicated that it was not able to ascertain whether there are potential tax liabilities in the People's Republic of China ("PRC") for such spot sales. BTHK also stated that it was unable to obtain sufficient documentation from the Registrant to satisfactorily review the use of the personal bank accounts of the Chief Financial Officer and a finance manager of the Registrant to collect certain sub-contracting charges and sales deposits of PRC customers of the Registrant, which the Registrant indicated such personal bank accounts were maintained solely for the Registrant's use. In addition to the above-described matters, there were a number of outstanding routine accounting matters for which BTHK asked the Registrant to provide further explanation and documentation which remained unresolved at the end of BTHK's engagement.

109.    On September 19, 2012, the Company announced that on September 14, 2012, the three purportedly independent directors of SinoHub, Inc., Lui, Jeff He, and Ted L. Shen, advised the Chairman of the Board of Directors that they were resigning effective September 14, 2012. The purportedly independent directors stated that their resignations were the result of three concerns:

- The resignation of the Company's auditor, BTHK, and the potential unavailability of funds to hire a new auditor;
- The lack of funding to support an independent investigation of the company and the CEO's inability to control the Company's operations, especially the allocation of funds for outside professionals; and
- The inability of the Audit Committee to arrive at any opinion on the Company's accuracy of financial data or efficiency in management and control because they have not been provided with financial information for review.

110.    On September 24, 2012, SinoHub filed a Form 8-K announcing that it had received a letter from the NYSE notifying the Company that its stock was subject to delisting because management engaged in operations contrary to public interest. The Form 8-K stated:

46

On September 19, 2012, SinoHub, Inc. (the "Registrant") received a letter from the NYSE MKT indicating that the Registrant is not in compliance with NYSE MKT listing rules to wit:

    1.  The letter stated that the Company is subject to delisting pursuant to Section 1003(f)(iii) of the Company Guide in that the Company or its management has engaged in operations, which, in the opinion of the Exchange, are contrary to the public interest. In this regard, Staff believes that the actions (including, but not limited to, inaction) raise significant public interest concerns.

- The resignation of Baker Tilly during the review of the Company's Form 10-Q for the period ended June 30, 2012 raises serious concerns that the reasons for the resignation may have been related to financial reporting and other irregularities at the Company.
- The Company's use of personal bank accounts in the name of its Chief Financial Officer and a finance manager raises significant concerns over whether such accounts were used for legitimate business purposes.
- The Chief Financial Officer's sole control over the Company's bank accounts raises serious concerns about the Company's internal controls.
- The Company's inability to retain an independent registered accounting firm, U.S. securities counsel, or audit committee raises concerns that the Company will not be able to meet its reporting and regulatory requirements in the near term.
- The Company's lack of disclosure regarding its inability to access its bank accounts and it failure to timely pay its creditors raises concerns as to whether the Company is properly communicating material news to the public.

    These actions by the Company, its management and/or its agents cast material doubt on the integrity of the Company's financial statements, its operations and internal controls. Thus, continued listing of the Company's common stock on the exchange would not be in the public interest.

    2.  The Company is subject to delisting pursuant to Section 1003(a)(iv) of the Company Guide in that its financial condition has become so impaired that it appears questionable in the opinion of the Exchange that the Company will be able to continue operations and/or meet its obligations as they mature. As noted above, the Company's CFO has not followed the instructions of the CEO to timely use the Company's funds to pay creditors and amounts owed to many creditors are now past due. Further, since the Company's CFO has sole control over the Company's bank accounts and the Company cannot determine when or if it will regain control over those accounts, it is unclear when or if the Company will be able to pay its creditors.

    3.  The Company is subject to delisting for failing to comply with the corporate governance standards set forth in Part 8 of the Company Guide. The resignation

of the Company's independent directors raises serious concerns over the Company's ability to exercise effective corporate governance. Specifically, with the resignations of Mr. Lui, Mr. He and Mr. Shen, the Company is noncompliant with the following corporate governance requirements applicable to smaller companies:

- Sections 801(h) and 802(a) of the Company Guide, in that the Company no longer has a board of directors comprised of at least 50% independent directors.
- Section 803(B)(2)(c) of the Company Guide, in that the Company no longer has an audit committee comprised of at least two independent directors;
- Section 804(a) of the Company Guide, in that the Company no longer has a nominating committee comprised solely of independent directors; and
- Section 805(a) of the Company Guide, in that the Company no longer has a compensation committee comprised of independent directors.

4. The Company is also subject to delisting for failure to comply with Section 803(B)(4) of the Company Guide which incorporates Rule 10A-3(b)(2), (4) and (5) of the Securities Exchange Act of 1934. Specifically:

- Under Rule 10A-3(b)(2), the audit committee must be directly responsible for the appointment, compensation, retention and oversight of the work of any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the issuer and each such firm must report directly to the audit committee. The company does not comply with these requirements since it no longer has an audit committee.
- Under Rule 10A-3(b)(3), each audit committee must have the authority to engage independent counsel and other advisors, as it determines necessary to carry out its duties. The Company does not comply with these requirements since it no longer has an audit committee.
- Under Rule 10A-3, each listed issuer must provide for appropriate funding, as determined by the audit committee for, among other things, payment of compensation to any: (1) registered public accounting firm engaged to prepare or issue a report or perform other audit, review or attest services for the issuer; or (2) advisors employed by the audit committee. The Company did not comply with these requirements when it had an audit committee insofar as the Company did not provide funding for the payment of auditors or to engage an outside consultant or audit firm to commence an investigation.

5. Staff has determined that the Company is not in compliance with Sections 134 and 1101 of the Company Guide based on the failure to timely file its Form 10-Q for the period ended June 30, 2012. The timely filing of such report is a condition for the Company's continued listing on the Exchange. In addition, the Company's failure to timely file this report is a material violation of its listing agreement with the Exchange. Given that the Company does not have an audit committee and it has not retained a new independent registered accounting firm since Baker Tilly's

resignation, it is uncertain when, or if, the Company will be able to file its Form 10-Q for the period ended June 30, 2012.

111.    On October 10, 2012, the NYSE announced its final determination to delist the common stock of SinoHub, effective October 22, 2012.  As a result, its shares are essentially worthless.

**C.    BTHK's False and Misleading Statements**

112.    In addition to the foregoing facts, BTHK, as auditor, had a responsibility to "plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud," and "express an opinion on the financial statements."  AU Sections 110.02-110.03.  Auditors, including BTHK, are required to perform their audits in accordance with PCAOB standards and generally accepted auditing standards ("GAAS").

113.    SOX authorized the PCAOB to establish auditing and related professional practice standards to be used by registered public accounting firms.  PCAOB Rule 3100, *Compliance with Auditing and Related Professional Practice Standards*, requires the auditor to comply with all applicable auditing and related professional practice standards of the PCAOB. The PCAOB has adopted as interim standards, the generally accepted auditing standards, described in the American Institute of Certified Public Accountants' ("AICPA") Auditing Standards Board's Statement on Auditing Standards No. 95, *Generally Accepted Auditing Standards*, in existence on April 16, 2003.

114.    The general, field work, and reporting standards approved and adopted by the membership of the AICPA, as amended by the AICPA Auditing Standards Board, are as follows:

*General Standards*

1.    The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

49

2.      In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.

3.      Due professional care is to be exercised in the performance of the audit and the preparation of the report.

*Standards of Field Work*

1.      The work is to be adequately planned and assistants, if any, are to be properly supervised.

2.      A sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

3.      Sufficient appropriate evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

*Standards of Reporting*

1.      The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP).

2.      The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

3.      Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

4.      The report shall contain either an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed.  When an overall opinion cannot be expressed, the reasons therefore should be stated.  In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

AU Section 150.02.

115.    An unqualified opinion represents the auditor's opinion that the financial statements present fairly an entity's financial position, results of operations, and cash flows in conformity with generally accepted accounting.   AU Section 508.7.   An auditor may only express an unqualified (or "clean") audit opinion when the auditor has formed such an opinion on the basis of an audit performed in accordance with GAAS.  *Id.*

116.    On February 9, 2010, SinoHub filed a Form 8-K announcing a change in its independent auditor:

> SinoHub, Inc. (the "Company") was notified that, effective January 29, 2010, the US Audit Practice of Jimmy C.H. Cheung & Co., the Company's independent registered public accounting firm ("JCHC"), merged with Baker Tilly Hong Kong Limited ("BTHK").  As of February 3, 2010, JCHC resigned as the independent registered public accounting firm of the Company and, with the approval of the audit committee of the Company's Board of Directors on February 3, 2010, BTHK was engaged as the Company's new independent registered public accounting firm.

117.    This disclosure was misleading because neither the Company, nor the auditor informed public investors that Jimmy Cheung had become the lead partner and director of auditing services of BTHK.  This information is material to investors because of the importance of maintaining an independent auditor.

118.    On March 11, 2011, SinoHub's auditor, BTHK issued a clean audit opinion representing that the Company's financial statements presented fairly, in all material respects, the financial position of SinoHub and its subsidiaries as of December 31, 2010 and 2009, and its operations and cash flows, were presented in conformity with U.S. GAAP.

Specifically, BTHK represented:

> We have audited the accompanying consolidated balance sheets of SinoHub, Inc. and subsidiaries as of December 31, 2010 and 2009 and the related consolidated statements of operations and comprehensive income, stockholders' equity and cash flows for the years ended December 31, 2010 and 2009.  The Company's management is responsible for these financial statements.  Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

***In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of SinoHub, Inc. and subsidiaries as of December 31, 2010 and 2009, and the results of its operations and its cash flows for the years ended December 31, 2010 and 2009, in conformity with accounting principles generally accepted in the United States of America.***

[Emphasis added.]

119.    BTHK agreed to the incorporation by reference in SinoHub's January 5, 2011 Registration Statement, of its report dated March 11, 2011 with respect to the consolidated financial statements of SinoHub, Inc. included in the Form 10-K for the year ended December 31, 2010.

120.    On March 30, 2011, SinoHub's auditor, BTHK, issued a clean audit opinion representing that the Company's financial statements presented fairly, in all material respects, the financial position of SinoHub and its subsidiaries as of December 31, 2010 and 2011, and its operations and cash flows, were presented in conformity with U.S. GAAP.

121.    BTHK's audit opinions were, however, false and misleading as issued, because (1) SinoHub's consolidated financial statements for the relevant time frame were materially misstated and, therefore, not in conformity with GAAP; and (2) SinoHub's audits could not have been conducted in accordance with GAAS and/or the standards of the PCAOB. These false and

misleading opinions were communicated to investors in the Form 10-K for 2010 and 2011 and by incorporation, SinoHub's January 5, 2011 Registration Statement, and March 16, 2011 Prospectus Supplement in which BTHK was expressly referenced as an "Expert."

122.   Had BTHK performed its audits in accordance with PCAOB standards and GAAS, maintaining independence in mental attitude, exercising due professional care, and gaining a sufficient understanding of internal control to determine the nature, timing and extent of tests to be performed and analyzing competent audit evidence, BTHK would not have issued a clean opinion and would have: (1) modified the nature and extent of audit procedures; (2) recommended significant adjustments to financial statements and disclosures; and/or (3) issued a qualified or adverse opinion, disclaimed its opinion, or issued no audit opinion at all. In light of the information known to BTHK, BTHK's failure to conduct a proper audit in accordance with GAAS and issue a clean opinion, knowingly or recklessly resulted in the issuance of false and misleading financial statements by SinoHub.

123.   Had BTHK performed its audits according to applicable standards, BTHK would have reported that: (1) SinoHub was misreporting revenues from its electronic component spot sales; and (2) none of SinoHub's management or staff was sufficiently competent in U.S. GAAP and, therefore, could not have prepared SinoHub's financial statements in accordance with U.S. GAAP. If it had performed an audit in accordance with GAAS, BTHK would have reported that Defendant Li, the CFO, maintained sole control of the Company's bank accounts, which should have been a red flag for fraud risk. A prudent auditor could not have conducted an audit of SinoHub in accordance with GAAS and concluded that SinoHub's financial statements were free of material misstatement and presented fairly the financial condition of SinoHub. Therefore, BTHK acted knowingly or recklessly in issuing two clean audit opinions containing material

misstatements, and in consenting to their incorporation in SinoHub's January 5, 2011 Registration Statement.

124.    On May 5, 2012, BTHK filed a Form 3, Change of Contact, with the PCAOB, changing its Auditing Director from Chi Hai "Jimmy" Cheung to Lai Ha "Helena" Kwok.

## CLASS ACTION ALLEGATIONS

125.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired SinoHub's common stock between May 17, 2010 and August 21, 2012 (the "Class"). Excluded from the Class are the Defendants, officers, and directors of the Company, as well as their families and the families of the Defendants, and those holding 5% or more of SinoHub's outstanding shares.

126.    Class members are so numerous that joinder of them is impracticable.

127.    Common questions of law and fact predominate and include whether Defendants: (a) violated the Exchange Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false and/or misleading; and (d) artificially inflated the price of SinoHub common stock and, if so, the extent and appropriate measure of damages.

128.    Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

129.   At all relevant times, the market for SinoHub's common stock was an efficient market for the following reasons, among others:

a.     SinoHub's stock met the requirements for listing, and was listed and actively traded on the NYSE under the symbol SIHI, a highly efficient and automated market;

b.     According to the Company's Form 10-Q filed May 15, 2012, as of April 27, 2012, there were over 33.4 million shares of SinoHub common stock outstanding.  During the Class Period, on average, tens of thousands of shares of SinoHub stock were traded on a daily basis, demonstrating a very active and broad market for SinoHub stock and permitting a very strong presumption of an efficient market;

c.     As a regulated issuer, SinoHub filed periodic public reports with the SEC;

d.     SinoHub regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services, the Internet, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e.     SinoHub was followed by several securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace;

55

f.      At all times during the Class Period, numerous National Association of Securities Dealers ("NASD") member firms were active market-makers in SinoHub stock; and

g.      Unexpected material news about SinoHub was rapidly reflected in, and incorporated into the Company's stock price during the Class Period.

130.    As a result of the foregoing, the market for SinoHub common stock promptly digested current information regarding SinoHub from publicly available sources and reflected such information in SinoHub's stock price.   Under these circumstances, all purchasers of SinoHub common stock during the Class Period suffered similar injury through their purchase of SinoHub common stock at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

131.    During the Class Period, as detailed herein, Defendants made false and misleading statements concerning SinoHub in a scheme to deceive the market.  This artificially inflated SinoHub's stock price and operated as a fraud or deceit on the Class.  Later, when Defendants' misrepresentations and fraudulent conduct became apparent to the market, SinoHub's stock price fell precipitously, as the prior artificial inflation came out of the stock price over time.  As a result of their purchases of SinoHub securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## FIRST CLAIM FOR RELIEF

### (For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants)

132.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

133.   Throughout the Class Period, Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of SinoHub common stock, knowingly or recklessly made materially false and/or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

134.   During the Class Period, Defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did:  (a) artificially inflate and maintain the market price of SinoHub common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (c) cause Plaintiff and other members of the Class to purchase SinoHub common stock at inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

135.   In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the investing public, Defendants had a duty to promptly disseminate truthful information with respect to SinoHub's operations and performance that would be material to investors in compliance with the integrated disclosure

provisions of the SEC, so that the market price of the Company's securities would be based on truthful, complete, and accurate information. SEC regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

136.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them.

137.    As a result of the dissemination of the materially false and/or misleading information and failure to disclose material facts as set forth above, the market price of SinoHub common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of SinoHub common stock was artificially inflated, and relying directly or indirectly on the false and/or misleading statements made knowingly or with deliberate recklessness by Defendants, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased SinoHub stock during the Class Period at artificially high prices and were damaged thereby.

138.    Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their SinoHub shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

139.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. 17 C.F.R. §240.10-5.

## SECOND CLAIM FOR RELIEF

### (For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants)

140.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

141.    The Individual Defendants acted as control persons of SinoHub within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their executive positions, board membership, and/or stock ownership, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading.  The Individual Defendants were provided with, or had unlimited access to, the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

142.    In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

143.    The Individual Defendants controlled SinoHub.

144.    By reason of such wrongful conduct, the Individual Defendants and SinoHub are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

(a)     Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding Plaintiff and other members of the Class damages together with pre and post-judgment interest thereon;

(c)     Awarding Plaintiff and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees, and other costs and disbursements; and

(d)     Awarding Plaintiff and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 19, 2012

SCOTT+SCOTT LLP

JOSEPH P. GUGLIELMO (#JG-2447)
DONALD A. BROGGI
The Chrysler Building
405 Lexington Avenue 40th Floor
New York, NY 10174
Tel.: (212) 223-6444
Fax: (212) 223-6334
jguglielmo@scott-scott.com
dbroggi@scott-scott.com

DAVID R. SCOTT
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Tel.: (860) 537-5537
Fax: (860) 537-4432
drscott@scott-scott.com

*Attorneys for Plaintiff*

60

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Graham Stirling, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.      I am the Manager – Investments of Ellsworth Investments Limited ("Ellsworth Investments").

2.      I have reviewed the Complaint in this matter and authorize Scott+Scott LLP to file a complaint and to file lead plaintiff papers in this matter.

3.      Ellsworth Investments is willing to serve as a representative party on behalf of the purchasers of SinoHub, Inc. ("SinoHub") securities during the Class Period, including providing testimony at deposition and trial, if necessary.

4.      During the Class Period, Ellsworth Investments purchased the SinoHub securities that are the subject of the Complaint as set forth on the attached Schedule A.

5.      Ellsworth Investments did not engage in the foregoing transactions at the direction of counsel, or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.      During the three-year period preceding the date of my signing this Certification, Ellsworth Investments has not served nor sought to serve as a representative party or lead plaintiff on behalf of a class in a private action arising under the Securities Act or the Exchange Act.

7.      Ellsworth Investments will not accept any payment for serving as a representative party on behalf of the class beyond its *pro rata* share of any recovery, except for such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed at *GIBRALTAR EUROPE*                 . (city, state)

ELLSWORTH INVESTMENTS LIMITED

*9TH NOVEMBER 2012*
Date

_____
Graham Stirling
Manager – Investments

1

<u>SCHEDULE A</u>

ELLSWORTH INVESTMENTS LIMITED

Class Period Transactions in SinoHub, Inc.

| Trade Date | Action (Buy/Sell) | Quantity | Price Per Share |
|---|---|---|---|
| 9/30/2010 | Buy | 4,800 | $1.90 |
| 10/1/2010 | Buy | 11,400 | $2.01 |
| 10/5/2010 | Buy | 300 | $2.01 |
| 10/6/2010 | Buy | 25,950 | $2.08 |
| 10/7/2010 | Buy | 30 | $2.09 |
| 10/7/2010 | Buy | 35,633 | $2.09 |
| 10/8/2010 | Buy | 11,000 | $2.11 |
| 10/21/2010 | Buy | 41,280 | $2.26 |
| 10/29/2010 | Buy | 24,050 | $2.25 |
| 1/6/2011 | Buy | 56,332 | $2.22 |
| 3/16/2011 | Buy | 65,787 | $2.19 |
| 3/23/2011 | Buy | 24,399 | $2.05 |
| 3/24/2011 | Buy | 25,641 | $1.95 |
| 3/30/2011 | Buy | 24,509 | $2.04 |
| 3/31/2011 | Buy | 25,641 | $1.95 |
| 4/1/2011 | Buy | 13,951 | $1.79 |
| 4/5/2011 | Buy | 17,473 | $1.45 |
| 4/6/2011 | Buy | 31,673 | $1.57 |
| 7/5/2011 | Buy | 32,083 | $1.08 |
| 7/6/2011 | Buy | 5,000 | $1.08 |
| 7/12/2011 | Buy | 7,300 | $1.08 |
| 8/3/2011 | Buy | 15,768 | $1.15 |
| 2/14/2012 | Buy | 10,850 | $0.57 |
| 2/15/2012 | Buy | 16,670 | $0.57 |
| 2/16/2012 | Buy | 3,000 | $0.57 |
| 2/21/2012 | Buy | 2,331 | $0.57 |
| 2/23/2012 | Buy | 15,612 | $0.57 |

11/9/2012

1